Joseph E. **TALBOT** et al., Members of the United States Tariff Commission, and the United States Tariff Commission, Appellants,

v.

**ATLANTIC STEEL COMPANY**, Appellee.

No. 15264.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 4, 1959.

Decided Feb. 4, 1960.

Seymour Farber, Atty., Dept. of Justice, with whom Asst. Atty. Gen., George C. Doub and Oliver Gasch, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for appellants.

Edwin G. Martin, Washington, D. C., for appellee.

Before WILBUR K. MILLER, WASHINGTON and DANAHER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

Section 7 of the Trade Agreements Extension Act of 1951 [1] requires the United States Tariff Commission, upon application by any interested party, to make an investigation to determine whether any product, upon which a concession has been granted under a trade agreement, is being imported in such increased quantities as to cause or threaten serious injury to domestic producers. It further provides that, should the investigation disclose actual or threatened serious injury, the Commission shall recommend to the President the withdrawal, modification or suspension of the concession, or the establishment of import quotas, to the extent necessary to limit or prevent such injury.

An application for investigation of barbed wire under Section 7 of the Act of 1951 was filed with the Tariff Commission November 20, 1958, by Atlantic Steel Company and other manufacturers of that product. Eight days later, the Commission dismissed the application and so refused to make the requested investigation which might have led to a recommendation that relief be granted. It promptly denied a subsequent petition for reconsideration. Thereupon Atlantic Steel Company filed this suit in the United States District Court against the individuals composing the Commission [2] to require them to grant its application and to proceed with an investigation of barbed wire in the manner set forth in the statute. From the District Court's judgment directing them to conduct the requested investigation the Commissioners appeal.

To determine whether Atlantic's application for an investigation met the requirements of Section 7, we first consider whether barbed wire is a "product upon which a concession has been granted under a trade agreement." The President concluded in October, 1947, a General Agreement on Tariffs and Trade with twenty-two foreign countries in which he committed the United States to a continuance or "binding" of barbed wire as free of duty and quota,[3] a status which it occupied under the Tariff

---

1. 65 Stat. 74, as amended, 19 U.S.C.A. § 1364. The pertinent portion of Section 7 is as follows:

"(a) Upon the request of the President, upon resolution of either House of Congress, upon resolution of either the Committee on Finance of the Senate or the Committee on Ways and Means of the House of Representatives, upon its own motion, or upon application of any interested party (including any organization or group of employees), the United States Tariff Commission shall promptly make an investigation and make a report thereon not later than six months after the application is made to determine whether any product upon which a concession has been granted under a trade agreement is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported into the United States in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products.

  *   *   *   *   *

"Should the Tariff Commission find, as the result of its investigation and hearings that a product on which a conces-

sion has been granted is, as a result, in whole or in part, of the duty or other customs treatment reflecting such concession, being imported in such increased quantities, either actual or relative, as to cause or threaten serious injury to the domestic industry producing like or directly competitive products, it shall recommend to the President the withdrawal or modification of the concession, its suspension in whole or in part, or the establishment of import quotas, to the extent and for the time necessary to prevent or remedy such injury. * * *

  *   *   *   *   *

"(f) In carrying out the provisions of this section the President may, notwithstanding section 350(a) (2) of the Tariff Act of 1930, as amended, impose a duty not in excess of 50 per centum ad valorem on any article not otherwise subject to duty." (This subsection was added by an Act of August 20, 1958.)

2. The original complaint was against the Commission as an entity. An amendment made the individual members parties defendant.

3. Such a commitment is known as a "concession."

Acts of 1913, 38 Stat. p. 164, § 1, par. 645; 1922, 42 Stat. p. 932, § 201, par. 1697 and 1930, 19 U.S.C.A. § 1201, par. 1800. It is thus seen that barbed wire is, and was when Atlantic's application was denied, a product upon which a concession has been granted under a trade agreement,—a fact which is not disputed here.

The appellants concede, moreover, that the "binding" of a free list item may account for an increase in importation, and hence may be the cause of conditions warranting relief under the provision of the General Agreement known as the "escape clause," [4] which permits the President unilaterally to withdraw or modify a concession if increased importation of the product covered thereby is causing or threatening serious injury to domestic producers. The escape clause was implemented by Executive Order 10082 of October 5, 1949, 19 U.S.C.A. § 1351 note, 14 Fed.Reg. 6105, which provided that "The Tariff Commission, upon the request of the President, upon its own motion, or upon application of any interested party *when in the judgment of the Tariff Commission there is good and sufficient reason therefor,*" shall make an investigation as to whether increased importation is causing or threatening serious injury to domestic producers. (Emphasis supplied.)

The Executive Order remained in effect from its promulgation in 1949 until it was superseded in 1951 by Section 7 of the Trade Agreements Extension Act. Congress did not include in Section 7 the words in the Executive Order which we have italicized, nor any similar expression, although it was urged to do so by the then chairman of the Tariff Commission.[5] So, unlike the Executive Order which gave the Tariff Commission discretion as to whether to make an investigation on the application of any interested party, Section 7 unqualifiedly directs an investigation to be made upon such an application. For this reason, the Tariff Commission does not have—and indeed it does not claim to have—discretion under the literal language of the statute as to whether to conduct an investigation on the application of an interested party.

That the Atlantic Steel Company is a domestic producer of barbed wire and so is an "interested party" within the meaning of Section 7, entitled to apply for an investigation thereunder with respect to that product, is not challenged by the appellants.

From the foregoing considerations it appears without dispute that Atlantic, an undoubted interested party, made an application for a Section 7 investigation on barbed wire, a product upon which a concession had been granted under a trade agreement; that the literal language of the section required the Tariff Commission to grant the application and make such an investigation; and that it refused to do so.

The Tariff Commissioners looked beyond what they call the "bare language" of Section 7, however, and found elsewhere a reason for holding the section inapplicable. In dismissing the application, the Commission said it "was confronted with a question of whether the 'escape clause' protective principle prevailed over an historic policy of Congress

4. The escape clause of the General Agreement, 61 Stat. (Part 5) A58, is in pertinent part as follows:

"If, as a result of unforeseen developments and of the effect of the obligations incurred by a contracting party under this Agreement, including tariff concessions, any product is being imported into the territory of that contracting party in such increased quantities and under such conditions as to cause or threaten serious injury to domestic producers in that territory of like or directly competitive products, the contracting party shall be free, in respect of such product, and to the extent and for such time as may be necessary to prevent or remedy such injury, to suspend the obligation in whole or in part or to withdraw or modify the concession."

5. Senate Finance Committee Hearings on H.R. 1612, 82nd Cong., 1st Sess., p. 1317 (1951).

to admit barbed wire free of import restrictions for the special and particular purpose of benefiting the American farmer."

Answering its own question, the Tariff Commission "held that the policy of Congress with respect to barbed wire, which was established in 1913, precludes the application of the 'escape clause' procedure to barbed wire *in the absence of a clear expression from Congress of a contrary intent.*" (Emphasis supplied.) Appellants say the Tariff Commission has a "special and intimate relationship" with Congress which authorized it to conclude that Section 7 was not intended to override what the Commission thought was an "historic" policy of Congress to exempt barbed wire from duty or quota. The question before us, then, is whether Congress had clearly expressed an intention to relax or abandon this "historic" policy before the Commission relied upon it in dismissing Atlantic's application.

The Tariff Act of 1930 was amended June 12, 1934, by adding § 350, the provisions of which are reproduced in the margin.[6] By extending to the President this broad power to enter into foreign trade agreements and "to proclaim * * * modifications of existing duties and other import restrictions, or * * * additional import restrictions," Congress manifested its intention to relax the rigidity of statutory control over tariff matters.

It was under the authority of the 1934 amendment that the President entered into the General Agreement on Tariffs and Trade and included in it an escape clause. But the 1934 Act also provided, in what is now § 350(a) (2) of the Act of 1930, 19 U.S.C.A. § 1351(a) (2), that the President should not transfer "any article between the dutiable and free lists." Section 350(a) (2) thus forbade the President to make barbed wire dutiable by proclamation, and so the escape clause of the General Agreement of 1947 was inapplicable to that product. It appears, therefore, that in 1934 Congress intended barbed wire to remain on the free list.

The prohibitory provision of the 1934 Act against removing any article from the free list was still in effect when the Trade Agreements Extension Act of 1951 was adopted, and was not changed by that statute.[7] Consequently, it might

6. Section 350 of the Tariff Act of 1930, as added by the Act of 1934, 48 Stat. 943, 19 U.S.C.A. § 1351, provides in pertinent part as follows:
"(a) * * * [T]he President, whenever he finds as a fact that any existing duties or other import restrictions of the United States or any foreign country are unduly burdening and restricting the foreign trade of the United States and that the purpose above declared will be promoted by the means hereinafter specified, is authorized from time to time—
"(1) To enter into foreign trade agreements with foreign governments or instrumentalities thereof; and
"(2) To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder. No proclamation shall be made increasing or decreasing by more than 50 per centum any existing rate of duty or transferring any article between the dutiable and free lists. * * *"

7. Whether this was due to oversight or intent is not made clear by the legislative history of the 1951 Trade Agreements Extension Act. And the legislative history of the 1958 amendment, which did nullify the 1934 prohibition, does not show why that action was not taken in 1951. We are inclined, however, to think the continued effectiveness of the 1934 provision was overlooked when the 1951 Act was adopted; for, by Section 6 of that Act, 19 U.S.C.A. § 1363, Congress required all future trade agreements to include escape clauses, and directed the President to insert such clauses in the existing agreements which did not already contain them. Then, procedure for determining whether the escape clause should be invoked was written into Section 7, as we have seen. Thus Congress seems to have intended that the escape provision should apply to, and might be invoked with respect to, all products covered by foreign trade agree-

well be said that Section 7 of the 1951 Act, as originally written, did not implement the escape clause of a trade agreement with respect to a product on the free list, because the escape clause itself did not apply to such a product; and that therefore the original Section 7 of the 1951 Act could not have been effectively invoked as to barbed wire, which the President could not then remove from the free list.

But on August 20, 1958, the original Section 7 of the 1951 Act was amended. Congress added to it what is now subsection (f):

"In carrying out the provisions of this section the President may, notwithstanding section 350(a) (2) of the Tariff Act of 1930, as amended, impose a duty not in excess of 50 per centum ad valorem on any article not otherwise subject to duty."

This amendment to Section 7 nullified the prohibitory provision of the 1934 Act, insofar as escape clause procedure is concerned. By thus making it possible for the President, in appropriate circumstances, to impose a duty on barbed wire, Congress relaxed its previous policy of keeping that product on the free list beyond the reach of removal therefrom by the Chief Executive. The amendment to Section 7 was of course in effect when the Tariff Commission denied Atlantic's application in November, 1958.

Another phase of Section 7 supports our conclusion: in requiring the Tariff Commission promptly to make an investigation, either upon the request of the President, upon resolution of either House of Congress or either Congressional Committee, or upon application of any interested party, the statute does not distinguish between the request, the resolu-

tion and the application. All three stand on the same footing. The application of an interested party is just as efficacious in causing a mandatory investigation as is a Presidential request or a Congressional or Committee resolution. So, if the Tariff Commission may deny the application of an interested party because it thinks Congress did not intend the escape clause to apply to the product in question, although a concession had been granted with respect to it, it may for that reason refuse the President's request or decline to act pursuant to a Congressional or Committee resolution. That the Commission would assert such authority is hardly conceivable.

Accordingly, we hold the Commission erred in assuming that Section 7, as amended in 1958, is not a clear expression of a Congressional intent to require an investigation on proper application concerning the importation of barbed wire. The statutory command that, on application of an interested party, an investigation be made concerning "any product upon which a concession has been granted under a trade agreement" was not limited, restricted or conditioned after the 1958 amendment. Unquestionably, we think, this language includes barbed wire, upon which a concession had been granted under the General Agreement on Tariffs and Trade concluded in 1947.

Another contention of the appellants remains to be discussed. They say (a) as Section 7 is an escape clause procedure, it can be invoked only with respect to a product upon which a concession has been granted in "a trade agreement *which includes an escape clause;*" [8] (b) Section 7 cannot be invoked as to any product upon which a concession was granted in the trade agreements with Honduras and El Salvador, because those agreements do not include escape clauses.

---

ments. The unrestricted implementation of Section 6, contemplated by Section 7, was for a time and rather anomalously prevented by the language of the 1934 Act which forbade the President to transfer any item from the free to the dutiable list.

8. We do not stop to examine the validity of this statement, because for the discussion we may assume, without deciding, the appellants are correct in reading into Section 7 the words they italicized.

**10**

From these two postulates, the appellants reach this conclusion:

"* * * It is manifest, therefore, that when the Commission receives an application for an investigation under Section 7 it must necessarily look beyond the bare language of the section to determine whether the section is apposite to the particular product. * * *"

This merely means that when the Commission receives an application for an investigation on a particular product, it must first determine whether the concession with respect to it was granted in the trade agreements with El Salvador or Honduras, or in one of the trade agreements which contain escape clauses.

■ To make this determination, the Commission necessarily must look beyond the "bare language" of Section 7; but it need look no further than the trade agreement involved, to see whether it includes an escape clause. For Section 7 is "apposite"—that is, pertinent or relevant—to any product upon which a concession has been granted under a trade agreement which contains an escape clause, as the appellants admit. The power to determine whether Section 7 is "apposite" to a particular product by ascertaining whether the trade agreement involved has an escape clause does not include the power to determine the escape clause does not apply to that product, and that therefore an investigation which has been applied for need not be made, even though it is required by Section 7.

[6] From what has been said, we think it quite clear that Section 7 is applicable to barbed wire, regardless of the fact that it was free of duty in the Acts of 1913, 1922 and 1930. We hold, as did the District Court, that Section 7 made it the plain, legal, ministerial duty of the Tariff Commission, on the application of the interested Atlantic Steel Company, to conduct an investigation as to whether the escape clause should be invoked with respect to barbed wire. In our view, no

agency has a relationship with Congress which entitles it to disobey a statutory mandate. After the investigation, the Commission is of course free to reach the conclusion it thinks is required by the facts disclosed.

Affirmed.